**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| Xhane Beatrice Kitchen-Ortega, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 1:26-cv-2101 |
| | § | |
| v. | § | |
| | § | |
| Equifax Information Services, LLC, | § | |
| Defendant. | § | |

## PLAINTIFF'S COMPLAINT

COMES NOW Plaintiff **XHANE BEATRICE KITCHEN-ORTEGA**, ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendant in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debts.

2. Defendant Equifax Information Services, LLC ("Equifax") is not reporting Plaintiff's Capital One Bank USA N.A. account ("Capital One") accurately as discharged in bankruptcy.

3. Defendant Equifax is also inaccurately reporting Plaintiff's bankruptcy in the Public Records section of her credit report.

4. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

6. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

7. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

8. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

9. Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

10. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

11. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

12. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

13. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

14. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), the named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over the Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

15. Plaintiff alleges that the Capital One account was included in her Chapter 7 bankruptcy filing in that the debt was incurred pre-petition and was subsequently discharged.

16. Despite the fact the Capital One account was discharged, it is reporting on Plaintiff's Equifax credit report without any payment status and without any notation of the discharge; all of which is patently incorrect and misleading.

17. Plaintiff alleges that Equifax is not reporting the Capital One account correctly as discharged in bankruptcy. This is patently incorrect and misleading as it appears the debt was not

discharged.

18. Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged in bankruptcy to report as an open account or without any pay status.

19. Plaintiff alleges that especially when the last reporting on the account was "charge off" the lack of discharge notation makes the account appear as if it is still outstanding and collectible due to a charge off balance.

20. Despite the fact Plaintiff filed bankruptcy on August 22, 2025 and received a discharge on December 1, 2025, Equifax is reporting her bankruptcy as filed on December 3, 2025.

21. Plaintiff alleges the filing date is patently incorrect and misleading.

22. Plaintiff alleges that the bankruptcy is to be removed from her credit report pursuant to the filing date; therefore, by reporting an inaccurate filing date, the bankruptcy will report for months longer than it legally is allowed to report.

23. Further, creditors reviewing the report will believe, and base Plaintiff's creditworthiness upon, the presumption that she filed bankruptcy more recently than she did.

24. Plaintiff alleges that the effect a bankruptcy filing has on your creditworthiness and credit score decreases as time passes; therefore, Defendant's inaccurate reporting is harming Plaintiff's creditworthiness and decreasing her credit score.

25. Plaintiff alleges the Defendant is familiar with FCRA requirements and subscribes thereto.

26. Plaintiff alleges the Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

27. Plaintiff alleges that all of the Defendant's actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

28. In the alternative, Plaintiff alleges that the Defendant's actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

29. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. FICO, Inc.**

30. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

31. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

32. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

33. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

34. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

35. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

36. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

37. The three largest CRAs are Experian Information Solutions, Inc. (Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

38. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

39. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

40. Each of the five (5) factors is weighted differently by FICO.

41. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

42. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

43. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

44. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

45. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

46. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions." *See id.*

47. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models.

These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score."

**B. e-OSCAR**

48. e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

49. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

50. The ACDV contains codes next to certain data fields associated with a credit file.

51. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

52. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

53. For clarification, an AUD or other regular transmission is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C. Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

54. When a consumer files bankruptcy, certain credit reporting industry standards exist.

55. Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

56. The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

57. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

58. The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

59. The CII field is a critical field for consumers as it directly relates and impacts a

consumer's creditworthiness.

60. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

61. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

62. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

63. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

64. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

65. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

66. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D. Plaintiff's Debts were Discharged Pursuant to her Bankruptcy**

67. Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on August 22, 2025, in order to repair her creditworthiness and Credit Score.

68. Plaintiff's no asset bankruptcy was discharged on December 1, 2025.

69. Plaintiff's obligation on the Capital One account was discharged on December 1, 2025.

**E. Plaintiff's Credit Report Contains Inaccurate and Adverse Reporting, which Plaintiff Disputed to no Avail**

70. On December 30, 2025, Plaintiff ordered an Equifax credit report to ensure proper reporting by Plaintiff's creditors (the "December 30 Credit Report").

71. Plaintiff noticed an adverse tradeline and Public Record section in her December 30 Credit Report, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA standards.

72. Plaintiff then disputed the inaccurate tradeline regarding the Capital One account

and Public Record section via mail to Equifax on or about February 19, 2026 (the "Dispute Letter").

73. Plaintiff's Dispute Letter specifically put Equifax on notice that Plaintiff filed Chapter 7 bankruptcy in August of 2025, received a discharge in December of 2025, that the Public Records section and Capital One account should be updated to accurately report the bankruptcy.

74. Plaintiff's Dispute Letter also included a copy of her Discharge Order which listed her specific discharge date as December 1, 2025.

75. Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

76. Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, failed to investigate and failed to properly update the Public Records section of her report.

77. Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, failed to investigate and failed to send the dispute to the data furnisher of the Capital One account.

78. On May 20, 2026, Plaintiff ordered another Equifax credit to determine if her accounts were updated.

**a. Inaccuracy – Public Records Section**

79. Despite actual knowledge, Equifax inaccurately reported Plaintiff's bankruptcy as filed on "December 3, 2025." This reporting is patently inaccurate as Plaintiff's bankruptcy was filed on August 22, 2025.

80. Plaintiff alleges that Equifax failed to investigate the date Plaintiff filed for bankruptcy.

81. Equifax failed to correctly update the Public Records section to reflect the actual filing date.

82. Based upon Plaintiff's dispute, Equifax should have known that Plaintiff filed a voluntary bankruptcy in August 2025 and received a discharged in December 2025.

83. Plaintiff alleges that Equifax failed to review if the reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or publicly available records concerning Plaintiff's bankruptcy filing date.

84. If Equifax reviewed such standards and records, it would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

85. Equifax should have updated the Public Records section to reflect the bankruptcy filed on August 22, 2025.

86. By misreporting the bankruptcy file date, creditors will believe Plaintiff filed bankruptcy more recently than she did.

87. By reporting the filing date incorrectly, Equifax is causing the bankruptcy to report for longer than legally required by the FCRA.

88. By failing to report the correct file date, creditors will be misled as to which debts were pre-petition and discharged.

89. The lack of investigation and reporting of inaccurate and incomplete information by Equifax is unreasonable.

**b. Inaccuracy – Capital One**

90. Despite actual knowledge, Equifax continued to report Plaintiff's Capital One account, ending in 4372, without any payment status and without notation of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy in December 2025.

91. Plaintiff alleges that Equifax failed to investigate whether Plaintiff filed for bankruptcy and received a discharge.

92. Equifax failed to update the Capital One tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

93. Equifax failed to provide notice to Capital One that Plaintiff was disputing the inaccurate and misleading information, and thus it failed to conduct a reasonable investigation of the information as required by the FCRA.

94. Based upon Plaintiff's dispute, Equifax should have known that Plaintiff received a discharged in her bankruptcy proceedings.

95. The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received her discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

96. Plaintiff alleges that Equifax failed to review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or publicly available records concerning Plaintiff's bankruptcy.

97. If Equifax reviewed such standards, it would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

98. Equifax should have updated the tradeline to CII Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy, marked the account as closed, and removed the unavailable payment status.

99. By continuing to report Plaintiff's account as described hereinabove, it incorrectly appears to third parties viewing Plaintiff's credit reports that the account was not discharged in bankruptcy, which is inaccurate.

100. As Plaintiff received a discharge and this debt is no longer owed, the reporting on the account is misleading.

101. As the account's last reported item was "charge off", the reporting is misleading as the lack of any bankruptcy notation further makes the account appear as if it is still outstanding and not discharged.

102. The term "charge off" means an account is closed, although the debt is still owed and may be sent to collections. By reporting Plaintiff's account as described herein above, it appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which is patently incorrect and misleading.

103. The lack of investigation and reporting of inaccurate and incomplete information by Equifax is unreasonable.

**F. Damages**

104. Plaintiff pulled the credit report at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

105. As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses and has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

106. Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Equifax. Further, Plaintiff's diminished creditworthiness, resulting from

Equifax's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

107. Equifax's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

**FIRST CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))**

**(Against Defendant)**

108. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Equifax Failed to Assure Credit Reporting Accuracy**

109. Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

110. In a 2007 class action settlement, Equifax agreed to modify its procedures regarding the reporting of all subsequent Chapter 7 bankruptcy discharges. See *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 382 (C.D. Cal. 2007).

111. As a part of the *Acosta* settlement, Equifax agreed to update reporting on all "Bankruptcy Qualifying Tradelines" accounts. This includes automatically updating the reporting on such accounts to remove the charge-off or collection rating, deleting any current and/or past due balances, and adding Chapter 7 bankruptcy notation on the tradeline. *Id*.

112. Further, Equifax agreed to establish procedures that it would, of its own volition, update any Bankruptcy Qualifying Tradelines subject to a reinvestigation request, by removing the derogatory information and adding bankruptcy notation. *Id*.

113. Equifax failed to report the Capital One account using the procedure it expressly agreed to adopt in *Acosta*.

114. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Capital One account as described herein.

115. Equifax knew, or should have known, (1) that the Capital One account was discharged in bankruptcy, (2) that the tradeline should reflect the discharge, (3) that the account should be reported as closed, and (4) that the account should not have been reported without any payment status as the debt was discharged. Further, Equifax knew, or should have known, that

this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

116. Had Equifax maintained reasonable procedures to assure maximum accuracy, it would have never reported the Public Records section as described herein.

117. Equifax knew, or should have known, (1) that Plaintiff filed bankruptcy on August 22, 2025, and (2) that the Public Records section should be accurate and reflect the correct filing date. Further, Equifax knew, or should have known, that this inaccurate and incomplete reporting does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

118. Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers."[2] The investigation and evaluation of Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting Equifax allowed.

119. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

120. Equifax is reporting Plaintiff owes debt that she does not actually owe, thereby damaging her credit score and creditworthiness.

121. Equifax is reporting Plaintiff filed bankruptcy much more recently than she did, thereby damaging her credit score and creditworthiness.

122. Equifax's reporting is particularly aggravating of Plaintiff's damages because the inaccurate reporting damaged Plaintiff's creditworthiness, which she is attempting to rebuild after bankruptcy.

**B. Willful Violations**

123. Equifax's violations, as described herein, were willful; specifically, Equifax has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

124. Equifax regularly, as a policy, ignores disputes by consumers and fails to perform

[2] *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019)

even a basic investigation regarding the disputes. Additionally, Equifax regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

125. To the extent Equifax does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving inaccurate reporting.

126. Equifax's employees receive little to no training concerning how to accurately report consumer debt.

127. Instead, Equifax's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

128. Equifax's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

129. Equifax has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

130. As a result of Equifax's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

131. Equifax's violations were willful, rendering it individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

132. In the alternative, Equifax was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

133. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(1))

## (Against Defendant)

134. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

### A. Equifax Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)

135. Pursuant to 15 U.S.C. § 1681i(a)(1), Equifax was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Capital One account and Public Records section.

136. Thus, Equifax failed to conduct a reasonable investigation and correct the misleading and/or inaccurate reporting within the statutory time frame.

137. Equifax is not a passive entity bound to report whatever information a data furnisher provides.

138. Plaintiff alleges Equifax is readily familiar with FCRA requirements and credit reporting industry standards.

139. Based on the foregoing, Plaintiff alleges that Equifax can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

140. Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

141. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that it was not reporting the Capital One account correctly.

142. Had Equifax conducted a proper investigation, it could have updated the Capital One account to reflect the bankruptcy discharge, report as closed, removed the missing payment status. However, Equifax continued to report the Capital One account as described herein.

143. Plaintiff alleges that Equifax failed to send an ACDV to Capital One to confirm accurate reporting on the account. Despite receiving the Dispute Letter providing notice of the inaccuracies, Equifax did not delete or correct the Capital One account or conduct an investigation regarding the account.

144. Equifax failed to conduct a reasonable investigation because any basic investigation would have uncovered that the Public Records section was reporting incorrectly and incompletely.

145. Had Equifax conducted a proper investigation, it could have updated the Public Records section to reflect the bankruptcy was filed in August 2025. However, Equifax continued to report the Public Records section as described herein.

146. Plaintiff alleges that Equifax failed to review the Discharge Order provided with her dispute, or search PACER or any other public database to confirm the bankruptcy filing date. Despite receiving the Dispute Letter providing notice of the inaccuracies, Equifax failed to

correct the Public Records section or conduct an investigation.

147. Equifax, therefore, did not conduct even the most basic investigation regarding the requirements set forth in the FCRA or credit reporting industry standards, otherwise the aforementioned would have been uncovered.

148. In the alternative, if Equifax deemed Plaintiff's Dispute Letter "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), Equifax failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from Equifax, Plaintiff alleges Equifax deemed her Dispute Letter valid and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which it failed to comply.

**THIRD CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))**

**(Against Defendant)**

149. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Equifax Failed to Review and Consider all Relevant Information**

150. Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

151. Plaintiff alleges Equifax did not seek to review any of Plaintiff's bankruptcy documents, including any from PACER or any other publicly available database. Had Equifax reviewed these documents, it would have seen the Capital One account was reporting inaccurately and should be reported as discharged in bankruptcy. In addition, Equifax would have seen Plaintiff filed bankruptcy in August 2025 and received a discharge, and therefore the Public Records section was reporting inaccurately.

152. Equifax's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B. Willful Violations**

153. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

154. In the alternative, Equifax was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. §

1681o.

155. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendant)**

156. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A. Equifax Failed to Delete Disputed and Inaccurate Information**

157. Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

158. Equifax's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B. Willful Violations**

159. Equifax's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

160. In the alternative, Equifax was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

161. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

162. WHEREFORE, Plaintiff prays for judgment as follows:

a. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

b. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

c. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

d. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

e. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**DEMAND FOR JURY TRIAL**

163. Plaintiff hereby demands trial of this matter by jury.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: July 28, 2026

*/s/ Joshua B. Lane*
Joshua B. Lane
Texas Bar No. 24092665
josh@schumacherlane.com

*/s/ Kyle W. Schumacher*
Kyle W. Schumacher
Texas Bar No. 24106831
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
210-541-2154 ph
210-783-1383 fax
Attorneys for Plaintiff